UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARNULFO FLORES, JR., personal
representative of the estate of
YOLANDA FLORES,

               Plaintiff,                    Case No. 07-11288

v.                                        Honorable David M. Lawson

LENAWEE COUNTY, SHERIFF
LARRY RICHARDSON, DEPUTY
JOHN DOE, DEPUTY JANE
DOE, RYAN TOADVINE, JAMES
WHITEMAN, DAVID BORTON,
and ADAM ONDROVICK,

               Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS OR FOR SUMMARY JUDGMENT AND SCHEDULING TRIAL

The plaintiff in this case, Arnulfo Flores, Jr., filed an action as the personal representative of the estate of his deceased wife, Yolanda Flores, alleging under 42 U.S.C. § 1983 that the defendants were deliberately indifferent to her medical needs while Ms. Flores was an inmate in the Lenawee County Jail. Ms. Flores was a diabetic, had a heart condition, and was addicted to heroin, and she died while she was in the defendants' custody. The complaint alleges that the defendants were responsible for her death and for her suffering prior to her death when she was in the defendants' charge. The plaintiff also brings a conspiracy count under 42 U.S.C. § 1985, contending that the defendants conspired to harm the plaintiff and then cover up their wrongful actions by attempting to destroy evidence and intimidate witnesses. All of the defendants filed motions for summary judgment. Thereafter, the plaintiff stipulated to dismiss the case against defendants Paul Dye and Leo Swinehart. The Court heard oral argument on the remaining motions on August 7,

2008.  At the argument, plaintiff's counsel conceded that the plaintiff no longer was contending that the conduct of the remaining defendants caused or contributed to the decedent's death.  The plaintiff also abandoned the case against the County.  The only remaining claims were based on the conspiracy claim and that the defendants' deliberate indifference caused the decedent to suffer pain because she was not given medication or treated for her ailments while in jail.  The Court finds, however, that defendants Whiteman and Richardson are entitled to summary judgment on the deliberate indifference claim, and all the defendants are entitled to dismissal of the conspiracy claim.  The matter will proceed to trial on the deliberate indifference claim against defendants Toadvine, Ondrovick, and Borton, but not on the theory that they caused or contributed to the decedent's death.

## I.  Facts

Yolanda Flores died in her cell at the Lenawee County Jail on the morning of December 13, 2006.  On December 11, 2006, Adrian police officers arrested Ms. Flores on two felony arrest warrants for writing checks with no account.  The officers brought her to the Lenawee County Jail, where she was placed in a holding cell for a short period of time and then booked at approximately 6:00 p.m.  Corrections Officer Ryan Toadvine was the intake officer at the time.  In keeping with standard procedure, Toadvine asked Flores a number of questions and made remarks concerning her health, noting that Flores appeared to be under the influence of heroin.  Flores told Toadvine that she consumed five packets of heroin per day and that she had Type II diabetes and a back problem.  It appears that Flores denied having any other medical problems.  However, Flores told Toadvine that she was taking three medications, listed in abbreviated form as "GLU, ANDI, INS" (presumably Glucophage, Anvandia, and insulin).  Jt. Defense Ex. D, Booking Med. Chart at 1.  The only medication Flores had with her at the time of booking was a vial of insulin.  Sergeant James

Whiteman was also present at the time of booking, but it is unclear whether he played any role in the booking process.

At the time of booking, Sergeant Paul Dye was the supervisor of the holding portion of the jail located on the lower floor. His shift began at 7:00 a.m. on December 11 and ended at 7:00 p.m. Toadvine and Whiteman apparently spoke with Dye about Flores's condition, and Dye had Flores placed in an observation cell due to concerns about heroin withdrawal. When Dye's shift ended at 7:00 p.m., Sergeant Whiteman replaced him as the officer in charge. Dye told Whiteman that "Ms. Flores was in the observation or in the holding cell and she was, what we considered, intoxicated or possibly under the influence of heroin and that she was there so that we could observe her." Jt. Defense Ex. H, Dye Dep. at 14. Dye also testified that he thought he told Whiteman she had insulin and "it was available upstairs." *Ibid.* However, Dye stated that Whiteman did not expressly acknowledge the statement, and Dye "forgot" to complete a written "pass-on log" where he would normally record the information that had been relayed. *Id.* at 16. Dye said medication was usually passed out to inmates four times a day and, had Flores been sober, she should have received her insulin at 10:00 p.m. on December 11. Flores did not receive her medication because Dye had deemed her under the influence.

The night of December 11 went relatively smoothly, but it was not without activity. It appears from telephone audio recordings that Flores made a call at 6:36 p.m. to someone (it sounds like two friends or relatives, one of whom refers to himself as "Pumpkin") on December 11. Jt. Def. Ex. O, Phone Recordings. She asked one of the individuals to "go down to the doc's[,] get all [her] medicine," and bring it down to the jail. *Id.*, recording 1 at 3:09. She said she would need it because she was going to experience detoxification. She stated that she would need her blood-pressure

medicine because her blood-pressure would be elevated. The man said he would try, but the medicine never came. Flores placed another call to a different person (a female named Nicki this time, apparently someone with whom Flores resided) at 1:46 a.m. on December 12. She was clearly distressed at this time. Ms. Flores told Nicki to get all of her medicine from the medicine cabinet, including Glucophage and four other medicines that were not named, as well as a special pair of glasses and all of her insulin from the refrigerator. *Id.*, recording 2 at 3:00. Nicki told Flores to advise the corrections officers that she would be "sending [Flores's] medication down." *Id.* at 3:26. Nicki said she would "walk it down there or something." *Id.* at 3:35. Yet the medication was not delivered until approximately 3:40 p.m. on December 12. Whiteman, who worked the 7:00-p.m.-to-7:00-a.m. shift on December 11 and 12, testified that he did not know Ms. Flores was diabetic or on medication because it was not written on a pass-on log and he did not look at the "med book." Whiteman admitted that he should have looked at the book, but he said he did not because he was "busy." Jt. Def. Ex. G, Whiteman Dep. at 43.

Sergeant Dye and Officer Swinehart both worked the 7:00-a.m.-to-7:00-p.m. shift on December 12. Dye testified that Flores first received medicine (an insulin shot) at approximately 1:00 p.m. that day. Dye said Flores received insulin at that time because "someone brought her medication to the jail." Dye Dep. at 28. However, this clearly is a mistake, as Swinehart testified that he administered the insulin Ms. Flores had when she arrived, and other medication did not arrive until 3:40 p.m. Dye said he attempted to procure Flores's medicine earlier in the morning (at around 10:00 a.m.) by calling a number Flores gave him for the purpose, but no one answered. Later in the day, one of Ms. Flores's friends called to inquire about her. Dye spoke with the individual and asked her if she could contact the family and have the medication brought in. Dye said the

medication was then delivered at approximately 1:00 p.m. Again, Dye's memory seems to be slightly off.

Swinehart's recollection is a bit different and seems to be the clearer of the two, although the differences in the two versions are not material to the determination of the motions. He says he tested Flores's blood-sugar level at around 1:00 p.m., and the machine displayed the number 483. Swinehart thought this number seemed "pretty high," Jt. Def. Ex. I, Swinehart Dep. at 17, but he was "not clear on . . . what's good and what's bad," *id.* at 19. After Flores took her insulin, she "was very coherent." *Ibid.* Accordingly, Swinehart did not bother to report Flores's blood-sugar level to Sergeant Dye.

At 3:40 p.m., Dye retrieved medication from a bag of medicine from that public entrance. Dye brought the medicine to Swinehart from the public jail entrance, "[a]nd in that bag . . . there was regular insulin that she's supposed to have and several bottles of pill prescriptions." *Ibid.* Swinehart then prepared dosage cards (based on bottles' labels) so that Flores would receive her medicine at appropriate times. The dosage charts showed the following dosage information:

> Lantus – 50 units in a.m. – test before meals.
> Nuvolog – (Insulin R) 200 to 250 equals two units plus two units each "50" after 250.
> Potassium CL – 10 ml. tablet, one tablet per day, 10 a.m.
> Metformin – 1000 ml. tablet, one tablet twice daily.
> Enalapril Maleate – 5 ml. tablet, one tablet twice daily, 10 a.m. - 10 p.m.
> Furosemide – 20 ml. tablet, one tablet per day, 10 a.m.
> Avadia – 8 ml. tablet, one tablet per day, 10 a.m.

Jt. Def. Ex. E, Death Investigation at 16-17.

At around 4:00 p.m., Swinehart had Flores test her blood-sugar again. Her blood-sugar level had dropped to 296, but she still injected herself with two units of insulin in keeping with the prescription. Swinehart said he did not give Flores any of her other medication because "the meds

were twice a day," and jail policy was to administer such medications at 10:00 a.m. and 10:00 p.m. Swinehart Dep. at 33-35. In fact, the death investigation report prepared by Washtenaw County shows that Ms. Flores did not receive the vast majority of her medication before she died. The report states that "LCJ dosage logs showed the following doses were given:"

> Lantrus, 50 units in 12/12/06, 1:15 p.m.
> Nuvolog, (Insulin R), 12/12/06, 1:15 p.m. "New Here," 12/12/06, 4:30 p.m., 2 units.
> Potassium CL, no record of dispensing.
> Metformin, no record of dispensing.
> Enalapril Maleate, no record of dispensing.
> Furosemide, no record of dispensing.
> Avadia, no record of dispensing.

Jt. Defense Ex. E, Death Investigation at 17.

Officer Swinehart and Sergeant Dye both ended their shifts at 7:00 p.m. on December 12. Officer Dye was off the following day, so he had no more contact with Ms. Flores. Swinehart worked an overtime shift on December 13, but he did so on a different floor of the jail, preventing any contact with Ms. Flores prior to her death. Swinehart thought other corrections officers would dispense Ms. Flores's medications beginning at 10:00 p.m. on December 12 and continuing every twelve hours based on the dosage chart he had completed. He also stated that Flores did not appear sick at either 1:15 or 4:15 p.m. on December 12 when he administered the insulin, and she did not ask Swinehart for help that day.

But Ms. Flores's condition worsened in the early morning hours of December 13. Sergeant Whiteman and Officer Toadvine worked the 7:00-p.m.-to-7:00-a.m. shift on December 12 and 13. It appears that Whiteman still had no knowledge of Ms. Flores's medication needs or her diabetic condition. However, Toadvine approached Whiteman in the early hours of December 13 and informed him that Ms. Flores was complaining of pain. Whiteman immediately spoke with Ms.

Flores, who told him that "her chest hurt, her back hurt," she had "aches all over her body and she had diarrhea and was vomiting." Whiteman Dep. at 54. Based on the nature of these complaints, Whiteman ruled out a heart attack and simply "told her to drink plenty of fluids and that the nurse would see her in the morning." *Ibid*. Whiteman then described the rest of the night and morning through 7:00 a.m., defending his actions along the way. He said that officer Toadvine complied with jail policy by notifying Whiteman of Ms. Flores's complaint of pain. Whiteman said he assessed Ms. Flores at the door of her cell, and she was awake and alert. He said he checked her again later, and he testified as follows:

> Q. In the course of the hours into the morning when she would have had her food, how many times do you think you saw her?
> A. Every time I walked by I would look in on her frequently.
> Q. What was she doing?
> A. Laying there sleeping, tossing and turning.
> Q. Did you have occasion to talk with her after her breakfast on the morning of [the] 13th?
> A. Yes.
> Q. Had she improved?
> A. Yes, by her own admission.
> Q. Did she have any complaint at that time of chest pain?
> A. None.
> Q. In your opinion did you reasonably think she needed other medical attention?
> A. No, I did not.
> Q. You had testified here that you failed to look at the medication book; was that a mistake?
> A. Yes.
> Q. Were you ignoring her?
> A. No.
> Q. You knew that she had some withdrawal from heroin, is that true?
> A. Correct.
> Q. Did you feel that that was life threatening?
> A. No.
> Q. Did you think that was a medical emergency?
> A. No.
> Q. Were you aware at any time that there were some oral medications that she should have been taking?
> A. No, I was not aware.

Q. If you had been aware what would you have done?
A. Given it to her.

*Id.* at 101-02.

As mentioned above, Toadvine also worked a shift starting at 3:00 p.m. on December 12 and extended to 7:00 a.m. on December 13, and he informed Whiteman of Ms. Flores's complaints. Toadvine testified that Flores complained to him of chest pain at approximately 3:00 a.m. on December 13. Flores contacted Toadvine through a push-button call system connected to her cell. As soon as Flores told Toadvine of the chest pains, he relayed the information to Whiteman. After Whiteman spoke with Flores, he instructed Toadvine to "keep a close eye on her." Jt. Def. Ex. F, Toadvine Dep. at 34. Toadvine was not aware at this time that Flores was on heart-related medication; he did not find out until after she had died. Toadvine did not question Whiteman or think to call a nurse or doctor because "that would be up to Sergeant Whiteman." *Ibid*. At some point in time during the night, Toadvine saw Flores "standing in the window of her cell." *Id.* at 38. He denies telling her at the point to "lay down and sleep it off." *Ibid.* Rather, he may have said, "Relax. The nurse will be in in the morning." *Id.* at 39. At about 5:50 in the morning, Toadvine overheard Whiteman asking Ms. Flores about her heroin use and informing her that it needed to stop out of concern for her health. When the shift changed at 7:00 a.m., Toadvine told his replacement, Officer Ondrovick, "to keep a close eye on [Flores because] she's been complaining of chest pains." *Id.* at 41.

At approximately 7:30 a.m., Sherry Beaudin, a Lenawee County deputy who happened to be in the jail for other business, heard Ms. Flores say, "Help. Help Me." Resp. Br., Ex. 1, Beaudin Dep. at 5. Beaudin asked Ondrovick if Flores was going through detoxification, and Ondrovick said she was.

So far the officers' characterization of their own actions, however negligent, does not appear vindictive. But the plaintiff offers the testimony of other inmates suggesting otherwise. John White, a pretrial detainee in the cell next to Ms. Flores, heard Flores ask for the jail nurse, Bonnie Mason, sometime after breakfast on the morning of December 13. Ondrovick responded by telling Flores to "[l]ay down and sleep it off." Resp. Br., Ex. 2, White Dep. at 5. Flores said she "needed her meds," but Ondrovick ignored her. *Id.* at 6.

Kelee Krohn was also housed in the jail as a pretrial detainee on December 12 and 13, 2006. He testified that Officers Whiteman, Toadvine, Ondrovick, and Borton all callously ignored Flores's pleas out of a desire to see her suffer for her actions. Krohn's affidavit reads:

> 3.  In a cell located across from me, I heard Yolanda Flores, moaning and in obvious pain. She was asking for her medication and to go to the hospital. This continued at various times throughout the early morning until just before noon on December 13, 2006. I was located just a few feet away from the booking desk I saw Deputies Whiteman, Toadvine, Ondrovick and Borton in the booking area. I was able to determine their names because they were printed on the uniforms they were wearing.
>
> 4.  In response to Yolanda's request for medical attention and medication, I saw and heard deputies Whiteman, Toadvine, Ondrovick and Borton ignore and indicate that the reason she was not receiving medical attention was punishment for the crimes Yolanda Flores was charged with. I also saw and heard Deputies Whiteman, Toadvine, Ondrovick and Borton tellYolanda "she had enough drugs in her" as well as to "lay down and sleep it off." I saw the officers talk to each other about this.
>
> 5.  I could tell that deputies Whiteman, Toadvine, Ondrovick and Borton heard what Yolanda Flores was saying. I could tell this because each time she said something to them they responded verbally or looked at her and waived their hand in a dismissive fashion that I believe was an indication that she was to lay down and quit bothering the deputies.
>
> 6.  I asked the correctional officers to give Yolanda her medication and I was told "to mind my own business" by David Borton.

Resp. Br., Ex. 3, Krohn Aff. at ¶¶ 3-6 (errors in original).

Two other inmates testified in similar fashion. Allen Wesson testified that he saw and heard Flores "crying and asking for her medication" for thirty to forty-five minutes on the morning of December 13. Resp. Br., Ex. 4, Wesson Aff. at ¶¶ 2-3. Mario Flores, who was also withdrawing from heroin at the time, stated:

> 3. I personally observed Yolanda Flores cry out for help, medical attention and medication. In response to Yolanda Flores's concerns, various correctional officers laughed and made jokes about her. They also used obscenities to describe her, telling her things like "lay down and sleep it off you f**king junky."

> 4. As time passed I observed that Yolanda Flores's requests for help became more stressful and I could tell from the sound of her voice that she was in physical pain. I inquired about her condition with a correctional officer. In response he placed a sheet of some type over the window of my cell so that I could not see out.

Resp. Br., Ex. 5, Flores Aff. at ¶¶ 3-4 (errors in original).

There is no dispute that Officer David Borton had no contact with Flores until around 7:00 a.m. on December 13, 2006. By his own admission, however, he was "the Utility Officer for the Booking Area where Ms. Flores's cell was located" at the time and therefore "was responsible for passing medication to inmates" in that area. Jt. Def. Ex. K, Borton Aff. at ¶¶ 4-5. Borton failed to give Flores her medication at the usual time (10:00 a.m.), but he testified that he had no idea Flores had heart issues:

> 3. I was never informed that Yolanda Flores had any type of heart condition or problem.
> . . .

> 6. At 10:00 a.m., the regular time for passing medications, I was busy with other assignments.

> 7. I spoke with Yolanda Flores confirming that she wanted her medications that morning. I did not ignore the medication cards which indicated she should receive insulin and oral medications that morning.

-10-

8. Before 11:00 a.m. when I was being assigned elsewhere, my supervisor Patricia Lennard agreed to pass Ms. Flores her medications in my place.

9. Once Ms. Flores was found without vital signs, I did instruct inmates in surrounding cells to move away from the windows in cell doors and to sit down. This was done as part of the routine practice for custody and control following such an incident, and was not based on any racial issues.

*Id.* at ¶¶ 3-9.

At around 11:15 a.m., a deputy found Yolanda Flores dead in her cell. The defendants have produced videotape footage of Flores in her cell – CDs seem to depict the entire 41 hours Flores was held in the cell – and it appears that Flores died quietly. The footage from 6:00 a.m. to 12:00 p.m. on December 13 shows Flores lying on her bed for the most part, while occasionally arising to vomit, use the facilities, or wash her face. Because the footage contains no audio feed, it is difficult to tell whether Flores was in obvious pain. Other than the vomiting, however, pain cannot be detected from the video itself. Flores suffered the heart attack while lying in bed, and officers responded without much delay.

An autopsy was performed by Dr. Bader Cassin, a medical examiner employed by Washtenaw County. Dr. Cassin concluded that

[d]eath was caused by the consequences of drug abuse (heroin, by history). . . . Insulin-dependent diabetes and high blood pressure, for which she had medical history and medications prescribed, were contributing conditions.

Jt. Def. Ex. Q, Cassin Report at 1. Cassin did not find congestive heart failure.

The plaintiff obtained a second opinion from Dr. Bernardino Pacris. After conducting an independent autopsy, Pacris concluded that Flores "died of congestive heart failure due to hypertension and . . . cardiovascular disease. Diabetes mellitus was contributory." Resp. Br., Ex. 6, Pacris Report at 6. However, Dr. Pacris admitted that Flores had never before been diagnosed

with congestive heart failure, and the time of her death "may have been the first time she ever had it." Jt. Def. Ex. R, Pacris Dep. at 32. Further, Pacris conceded that Flores did not disclose to the defendants any heart problems whatsoever.

The defendants have also offered the affidavits of Flores's treating physicians, Dr. Larry Jennings and Dr. Ali Orandi. These affidavits tend to support the defendants' claim that the death was not due to failure to receive prescription medication.

Nevertheless, it is undisputed that Flores *did* have a serious, unknown heart condition. On August 31, 2002, Flores went to the emergency room after shooting up heroin complaining of a "weird feeling" in her chest. Jt. Def. Ex. W, Emerg. Rm. Rep. at C351. Tests revealed that she had cardiac dysrhythmia, i.e., an irregular heartbeat. The attendant's notes show that Flores refused further examination or treatment and essentially ignored the finding. *See id.* at C352 ("Aware that 'you could die, this could kill you,' Pt. States 'I feel better, I think I'm fine.'"). On March 1, 2005, a physical exam at Dr. Jennings's office caused some concern about Flores's heart, and the doctor scheduled a heart consultation for Flores with another physician. However, Flores cancelled the appointment and "would not" reschedule.

In addition to his claim for deliberate indifference directed against various jail officers, the plaintiff also brings a claim for conspiracy under § 1985. To support this claim, the plaintiff points to evidence of witness intimidation. Allen Wesson testified that he experienced as much when he returned to the jail in 2007:

> 6. Towards the end of 2007 I was incarcerated again in the Lenawee County Jail. While at the jail a correctional officer wearing a brown uniform, who was short in height with dark hair and glass, a mustache and a heavy build ordered me out of my cell and placed me in an interview room. He told me that he knew that I knew about the circumstances surrounding Yolanda Flores's death. Then he told me that I "shouldn't get involved because it will cause a bunch of problems."

7.  I told the correctional officer that if called upon to testify I would tell the truth. The correctional officer became visibly angry with me and his face turned red in color.  I believe that the name on the officer's uniform was Dye.

8.  I did not contact Yolanda Flores's family because I was concerned about what law enforcement may do to me based on the statements made by the correctional officer as stated in paragraph 6.

Wesson Aff. at ¶¶ 6-8.

Further, the plaintiff has alleged in his complaint that Sheriff Richardson engaged in wrongdoing by seeking to cremate Flores's body to destroy evidence.  The principal allegation reads as follows:

127.  On December 13, 2006 approximately one and a half hours after Decedent Yolanda Flores's death Defendant Sheriff Larry Richardson went to the home of Daniel Norden, who is Decedent Yolanda Flores's mentally challenged son, in an attempt to obtain permission to cremate the remains of Yolanda Flores to destroy the evidence of the various Defendant's wrongs.

Sec. Amend. Compl. at ¶ 127.  The plaintiff alleges Richardson was aware of Daniel Norden's disability and targeted him specifically for this reason.  *Id.* at ¶ 129.  Daniel Norden testified that he received a phone call from Richardson: "He wanted to ask me – some funeral home was willing to pay for all expenses and costs if I cremate the body if they took it."  Resp. Br., Ex. 6, Norden Dep. at 14.  Richardson then came over to speak with Norden personally.  *Ibid.*  Norden refused the offer. *Ibid.*  Sheriff Richardson has testified in response that he "did not know Daniel Norden had mental limitations."  Jt. Def. Ex. ff, Richardson Aff. at ¶ 10.  Further, although he does not deny speaking to Norden, Richardson suggests that he "had no control over the body once [Flores] passed away," because law requires the county medical examiner to conduct an autopsy when a person has died in custody.  *Id.* at ¶ 13 (citing Mich. Comp. Laws § 52.202).

Finally, the plaintiff brought a claim challenging Lenawee County's formal policy that conditions the administration of medication on sobriety, at least when there is no nurse or doctor present. However, the plaintiff abandoned that claim at oral argument on the summary judgment motions.

After the various dismissals by stipulation and the concessions by the plaintiff at the motion hearing, there remains a claim against defendants Whiteman, Toadvine, Ondrovick, and Borton for violating Yolanda Flores's constitutional rights under the Fourteenth Amendment as a pretrial detainee, via 42 U.S.C. § 1983, for deliberate indifference to medical needs; and a claim for conspiracy under 42 U.S.C. § 1985 against these defendants plus Sheriff Richardson, contending that the defendants conspired to harm the plaintiff and then cover up their wrongful actions by attempting to destroy evidence and intimidate witnesses. The plaintiff alleges damages based on Yolanda Flores's suffering while she was in jail without her medication, but the plaintiff no longer argues that the defendants caused Ms. Flores death.

## II. Discussion

Defendants Whiteman and Ondrovick, for their part, and defendant Richardson, for his part, each have moved for dismissal of the claims under Federal Rule of Civil Procedure 12(b)(6). Whiteman and Ondrovick argue that the allegations in the second amended complaint do not establish a constitutional violation on their part. Richardson argues that the complaint does not make out a claim against him for personal or supervisory liability under 42 U.S.C. § 1983 in count one, and there are insufficient allegations of an agreement to establish a conspiracy in count two. All of the defendants contend, now that discovery is complete, that they are entitled to judgment as a matter of law under Rule 56. They also argue that they are entitled to qualified immunity.

-14-

Motions to dismiss are governed by Rule 12(b) of the Federal Rules of Civil Procedure and allow for dismissal for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). When deciding a motion under that Rule, the court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. __, 127 S.Ct. 1955, 1974 (2007).

"[A] judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations." *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995). "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Ibid.* Federal Rule of Civil Procedure 8(a) requires that the complaint give the defendant fair notice of the nature of the claim and the factual grounds upon which it rests. *Twombly*, 127 S.Ct. at 1964. Therefore, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detail factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (citations omitted) (alteration in original). "In practice, 'a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (1984)); *see also Ana Leon T. v. Fed. Reserve Bank*, 823 F.2d 928, 930 (6th Cir. 1987) (per curiam) (mere conclusions are not afforded liberal Rule 12(b)(6) review).

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

A. Conspiracy claim

The plaintiff alleges conspiracy against all the defendants in violation of both 42 U.S.C. § 1985(2) and (3). A conspiracy claim under section 1985(3) is the more common of the two claims and simply piggy-backs on the underlying civil-rights deprivation, which is discussed below. "To succeed in establishing a § 1985(3) claim, the plaintiff must demonstrate '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.'" *Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 832 (6th Cir. 2007) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 518 (6th Cir. 2003)). On the other hand, section 1985(2) condemns conspiracies to obstruct justice or to

intimidate parties, witnesses, or jurors. "To sustain a cause of action under 42 U.S.C. § 1985(2), a plaintiff must prove the existence of a conspiracy among 'two or more persons.'" *Doherty v. American Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984). The purpose of the conspiracy must be to intimidate or injure a witness so as to deter that witness from testifying, and the conspiracy must actually harm the plaintiff. *See Portman v. County of Santa Clara*, 995 F.2d 898, 909 (9th Cir. 1993); *Alexander v. Patterson*, 34 F.3d 1068, 1994 WL 419582, *1 (6th Cir. Aug. 10, 1994) (Table).

"It is 'well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim . . . .' *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987). Accordingly, "pleading requirements governing civil conspiracies are relatively strict." *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008). With respect to the subsection (3) claim, the plaintiff alleges that "Defendants Ryan Toadvine, Paul Dye, Leo Swinehart, James Whiteman, David Borton, Adam Ondrovick, and Sheriff Larry Richardson acting in concert with each other deprived Yolanda Flores of life-sustaining medications and emergency medical care." Second Am. Compl. at ¶ 118. However, the plaintiff has not alleged facts to show an agreement to act with deliberate indifference to a serious medical need. Certainly, the conspiracy claim cannot stand against Whiteman; as discussed below, the plaintiff has not pled sufficient involvement in the alleged civil-rights deprivation by Whiteman, let alone that he conspired to facilitate it. As to Toadvine, Swinehart, and Borton, the complaint contains sufficient factual allegations to show that they *individually* acted to deprive Flores of her Eighth Amendment rights, but it fails to contain allegations from which an inference of conspiracy – an agreement – can be drawn. The plaintiff does not allege facts showing an express agreement, and the circumstances alleged are not so peculiar as to demonstrate a tacit agreement. Rather, based

on the facts pleaded in the seconded amended complaint, it appears only that Toadvine, Swinehart, and Borton each acted recklessly and perhaps harbored some resentment towards Flores given her status as a drug-user. *See, e.g.*, Second Amend. Compl. at ¶¶ 65-70, 83-84, 90-95. This is not sufficient to state a claim for conspiracy under 42 U.S.C. § 1985(3). *See Center for Bio-Ethical Reform*, 477 F.3d at 832. There are no allegations of a conspiracy to deprive the decedent of her medications against defendant Richardson. The subsection (3) conspiracy count will be dismissed against all the defendants.

Turning to the claim for conspiracy under section 1985(2), the plaintiff's allegations in this regard are more specific yet narrower in scope. The complaint reads in relevant part:

> 127. On December 13, 2006 approximately one and a half hours after Decedent Yolanda Flores's death Defendant Sheriff Larry Richardon went to the home of Daniel Norden, who is Decedent Yolanda Flores's mentally challenged son, in an attempt to obtain permission to cremate the remains of Yolanda Flores to destroy the evidence of the various Defendant's wrongs.

> 128. When Defendant Sheriff Larry Richardson went to Daniel Norden's home he did so by driving past the home of Plaintiff Arnulfo Flores, Jr., who does not suffer from any mental impairments.

> 129. Defendant Sheriff Larry Richardson made this choice in the hopes of taking advantage of the limited mental capacity of Daniel Norden as well as to protect his fellow co-conspirators.

> 130. Defendant David Borton and a fellow female coconspirator still unknown to Plaintiff threatened Kelee Krohn, an inmate in the Lenawee County Jail who observed and heard the various wrongs committed by Defendants.

> 131. Defendant David Borton, while standing next to an unknown female co-conspirator, stated to Kelee Krohn that "if you repeat or tell anyone what happened you will be back and it will not be in the county jail."

> 132. The unknown female co-conspirator then stated to Kelee Krohn, "I hope you understood what he just said to you."

> . . .

134. Agents of the Defendants went to the Purse Funeral home to contact Berry Purse, a witness for Plaintiff, in an attempt to intimidate the witness and threaten criminal prosecution for "body snatching" as it related to Decedent Yolanda Flores's remains.

135. This "investigation" into the Purse Funeral home began over one year after the death of Decedent Yolanda Flores but less than five days after the deposition of Daniel Norden.

136. The actions of conspirators were at one time on video recording. Co-conspirators destroyed the tapes, which depicted all Defendant's [sic] wrongs in furtherance of the conspiracy.

137. Defendants Sheriff Larry Richardson, Ryan Toadvine, Paul Dye, Leo Swinehart, James Whiteman, David Borton, and Adam Ondrovick and their unknown agents carried out the conspiracy with the object of depriving Decedent Yolanda Flores of Constitutionally protected rights as well as avoid detection of their wrongs by destroying evidence, intimidating witness [sic], and conducting a mock investigation.

Second Am. Compl. at ¶¶ 127-37.

There are a pair of problems with these allegations. First, the plaintiff fails to allege with specificity acts showing conspiracy among *all* the individual defendants. To be sure, the allegations regarding Borton and an "unknown female co-conspirator" are sufficient to imply an agreement as to those two individuals, but no more. More importantly, however, there is a general rule that precludes the plaintiff's claim apart from any pleading deficiency: "the civil rights of a person cannot be violated once that person has died." *Ford v. Moore*, 237 F.3d 156, 165 (2d Cir. 2001) (quoting *Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743, 749 (10th Cir. 1980)). This does not necessarily mean that the plaintiff could not theoretically assert a claim based on these allegations. However, as in *Ford*, "whatever post-death claim the Plaintiff might have in h[is] capacity as [personal representative] has not been alleged." *Ford*, 237 F.3d at 165 (internal citation omitted). In light of the rule that the civil rights of a person cannot be violated after that person has died, the

conspiracy claim under § 1985(2) alleging a post-death conspiracy against Ms. Flores must be dismissed as to all defendants.

## B. Deliberate indifference claim

The plaintiff's main contention is that the jail officers violated Ms. Flores's constitutional rights by failing to respond to her cries for medical help when she was undergoing painful drug withdrawal and suffering from other acute serious ailments. Although the Eighth Amendment secures protection against deliberate indifference to serious medical needs of convicted persons, *Farmer v. Brennan*, 511 U.S. 825 (1994), the Due Process Clause of the Fourteenth Amendment provides similar protection to pre-trial detainees. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001). The distinction matters little, however. In both instances, "[t]he test to determine whether [a defendant] acted with 'deliberate indifference' has an objective and subjective component." *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).

To satisfy the objective component, the plaintiff must allege that the medical need asserted is "sufficiently serious." *Farmer*, 511 U.S. at 834. "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

### 1. Defendant Richardson

With respect to the claim for deliberate indifference, defendant Richardson argues that the complaint fails to state a claim for personal liability "because there [are] no allegations that [he] had any involvement with Flores until after her death." Br. in Supp. at 3. That statement is accurate.

However much the cover-up allegations may suggest wrongdoing on Richardson's part, the complaint does not aver that Richardson wronged Flores when she was alive. Because "the civil rights of a person cannot be violated once that person has died," *Ford*, 237 F.3d at 165 (quoting *Silkwood*, 637 F.2d at 749), the section 1983 action against Richardson will be dismissed.

## 2. Defendant Whiteman

Officer Whiteman contends that the plaintiff has failed to state a claim against him because the complaint, as it presently stands, fails to allege specific facts against him that may give rise to liability. The Court agrees. Whiteman's acts and omissions as alleged and as disclosed through discovery do not rise to the level of a constitutional violation. In the factual allegation section of the complaint, the plaintiff simply states that Whiteman did not know the jail possessed a chart directing officers to contact a physician when an inmate's blood-sugar level exceeds 300 and did not know "the possible medical ramifications of high or low blood sugar." Sec. Am. Compl. at ¶ 105. The plaintiff then names Whiteman in the counts (where he asserts the legal elements in conclusory terms) along with the other defendants without specifying who did what. For example, in the first count the plaintiff says the "Defendants" all acted with deliberate indifference and then states that "Defendants Sheriff Larry Richardson, Ryan Toadvine, Paul Dye, Leo Swinehart, James Whiteman, Adam Ondrovick, and David Borton, acting under color of state law, and in furtherance of the policies of Lenawee County, authorized, tolerated, ratified, permitted or acquiesced in the creation of policies, practices and customs, establishing a de facto policy of deliberate indifference to individuals such as Decedent." *Id.* at ¶ 115. The one genuinely factual allegation concerning Whiteman simply does not form the basis for a claim of deliberate indifference. *See Farmer*, 511 U.S. at 834, 837. And the more general legal conclusions cannot alter this result, as *Bell Atlantic*

*Corp. v. Twombly* teaches us that "a formulaic recitation of the elements of a cause of action will not do." 127 S.Ct. at 1964-65. Therefore, defendant Whiteman's motion to dismiss will be granted. Moreover, in light of the facts marshaled by the plaintiff in discovery, leave to amend will not be granted as to this defendant.

### 3. Defendant Ondrovick

Officer Ondrovick also argues that the plaintiff has failed to state a claim against him, but that argument must fail. The plaintiff made a number of specific allegations regarding Ondrovick, including the fact that Ms. Flores informed Ondrovick of her "illness and poor health condition," Sec. Amend. Compl. at ¶ 85, Ondrovick attributed her moans and cries to heroin withdrawal, Ondrovick told Flores to "shut the f**k up . . . . I am sick of you bothering me," *id.* at ¶ 88, and he generally ignored Flores's desperate need for medical attention. Although threats and verbal abuse alone do not constitute a deprivation of a constitutional right, *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989), *Maco v. Bryon*, 760 F.2d 95, 97 (6th Cir. 1985), the complaint here alleges sufficient facts from which a jury could find deliberate indifference to a serious medical need. Accordingly, the case for deliberate indifference against Ondrovick will not be dismissed under Rule 12(b)(6).

Nor is defendant Ondrovick entitled to summary judgment under Rule 56. The record indicates that Ondrovick first had contact with Ms. Flores at 7:00 a.m. on December 13. Ondrovick replaced Ryan Toadvine, who told Ondrovick "to keep a close eye on [Flores because] she's been complaining of chest pains." Toadvine Dep. at 41. Whereas things were relatively quiet when Toadvine was watching Flores, Flores's condition worsened on Ondrovick's watch. Flores cried, "Help. Help me," but Ondrovick apparently dismissed the pleas as the result of harmless (however

painful) heroin withdrawal. John White, a pretrial detainee in the cell next to Flores, heard Flores ask for the jail nurse, Bonnie Mason, sometime after breakfast on the morning of December 13. Ondrovick responded by telling Flores to "[l]ay down and sleep it off." White Dep. at 5. Flores said she "needed her meds," but Ondrovick ignored her. *Id.* at 6. The medical proof in this case does not establish that Ms. Flores cries of pain were connected with a condition that eventually caused her death that morning, as the plaintiff now concedes. However, "while medical proof may be necessary to assess whether the denial of medical care caused a serious medical injury in cases where the prisoner['s] . . . 'affliction is seemingly minor or non-obvious,' no such evidence is required where the individual had a 'serious need for medical care that was so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004)). A jury could conclude that Ms. Flores's complaints of physical pain indicated a serious medical problem, which ought not to have been cavalierly dismissed by a jailer untrained in medical matters. Add to that the testimony of Kelee Krohn, which implicates Ondrovick as much as anyone else, and there is adequate evidence to create a jury question on the subjective element as well. Defendant Ondrovick therefore is not entitled to dismissal or summary judgment.

### 4. Defendant Borton

David Borton also moves for summary judgment, but the Court believes that the case against him is stronger than the one against Ondrovick. Borton did not have contact with Ms. Flores until 7:00 a.m. on December 13, and he was supposed to give her insulin and oral medications at 10:00 a.m. per the jail medication cards. However, Borton failed to give Ms. Flores the medicine because

he was busy with other duties, and he passed the task on to Patricia Lennard at around 11:00 a.m. Although Borton testified he had no idea Flores had a heart condition, it was reckless to delay Flores's receipt of insulin and other medications, particularly when he knew that Flores had been begging for her medications throughout the morning. The affidavit of Kelee Krohn against Borton establishes the subjective element of the claim, since a jury could conclude that his failure to give medication in the face of Flores's complaints demonstrated that Borton "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

### 5. Defendant Toadvine

Likewise, the case against Officer Toadvine is sufficient evidence to withstand summary judgment. Toadvine was in charge of booking Ms. Flores, and he asked her a number of health related questions when she arrived at the jail on December 11, 2006. The evidence suggests that Toadvine may have been less than thorough in assessing Flores's health, but there is also evidence to suggest Flores was less than forthcoming. In any event, Flores's health remained relatively stable through Toadvine's shift that night. Toadvine came back to work the 3:00 p.m. to 7:00 a.m. shift on December 12 and 13. Flores complained of chest pain to Toadvine at approximately 3:00 a.m. on December 13. Toadvine immediately relayed this information to Whiteman, his superior officer, pursuant to department policy. After Whiteman spoke with Flores, he instructed Toadvine to "keep a close eye on her." Toadvine Dep. at 34. Toadvine was not aware at the time that Flores was on heart-related medication. *Id.* at 33. Toadvine did not question Whiteman or think to call a nurse or doctor because "that would be up to Sergeant Whiteman." *Id.* at 34. At some point in time during the night, Toadvine saw Flores "standing in the window of her cell." *Id.* at 38. He told Flores,

"Relax. The nurse will be in in the morning." *Id.* at 39. When the shift changed at 7:00 a.m., Toadvine told his replacement, Officer Ondrovick, "to keep a close eye on [Flores because] she's been complaining of chest pains." *Id.* at 41. Looking at these facts alone, there is ample evidence to suggest that Flores was suffering from an objectively serious ailment, but no evidence that Toadvine was aware of this fact. But then there is the testimony once again of fellow inmate Kelee Krohn, who stated that he "saw and heard" the deputies, including Toadvine, "indicate that the reason she was not receiving medical attention was punishment for the crimes Yolanda Flores was charged with," and this indication was "[i]n response to Yolanda's request for medical attention and medication." Krohn Aff. at ¶ 4. The defendants contend that Krohn's statements are rather farfetched, and perhaps they are, but if believed, a jury could conclude that it proves deliberate indifference. It is for the jury, and not the Court, to decide matters of credibility. *See, e.g., CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). On balance, the Court must conclude that defendant Toadvine is not entitled to summary judgment.

## C. Qualified immunity

The defendants also argue that they are entitled to qualified immunity. "To overcome a qualified-immunity defense in the setting of a constitutional tort, a plaintiff must establish (1) that the defendant violated a 'constitutional right' and (2) that the right 'was clearly established.'" *Leary v. Livingston County*, 528 F.3d 438, 441 (6th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

The qualified immunity issue in this case is fact-bound. Certainly, it is clearly established that pretrial detainees are entitled to be free from cruel and unusual punishment, and deliberate indifference to a serious medical need amounts to cruel treatment at the hands of a jailer. *See*

*Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001); *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).  But assessment of the qualified immunity defense "must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable."  *Saucier*, 533 U.S. at 201.

Viewing the facts in the light most favorable to the plaintiff, a jury could conclude that defendants Toadvine, Ondrovick, and Borton each perceived a serious medical need by Ms. Flores and chose to ignore it in order to punish her.  If those facts are true, the defendants' conduct would fall well outside the "hazy border" that divides acceptable from unreasonable conduct.  *See Saucier*, 533 U.S. at 206.  The Sixth Circuit has consistently held that "[w]here the reasonableness of an officer's actions hinge on disputed issues of fact, 'the jury becomes the final arbiter of . . . immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury.'"  *Leonard v. Robinson*, 477 F.3d 347, 354, 355 (6th Cir. 2007) (quoting *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989)).  Therefore, " '[w]here . . . the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability,' and thus summary judgment should not be granted."  *Griffith v. Coburn*, 473 F.3d 650, 656-57 (6th Cir. 2007) (quoting *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998)); *see also Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 831 n.16 (6th Cir. 2007) (holding that "[w]here improper motivation constitutes an element of the claim . . . and the claimant has shown all other elements, a question of fact remains as to the official's intent, thereby precluding summary judgment on the basis of qualified immunity"); *Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 362 (6th Cir. 2007) (stating the familiar rule that

"[a]pplication of the qualified-immunity doctrine is a question of law; 'to the extent that there is disagreement about the facts . . . we must review the evidence in the light most favorable to the Plaintiff, taking all inferences in his favor").

Because the facts taken in the light most favorable to the plaintiff show that defendants Toadvine, Ondrovick, and Borton deprived the plaintiff's decedent of a clearly established constitutional right, and because there are disputed issues of fact, these defendants are not entitled to summary judgment based on qualified immunity.

### III.  Conclusion

The plaintiff has conceded that he cannot succeed on his claim against defendant Lenawee County.  The Court finds that all the defendants are entitled to dismissal of the conspiracy claims in count two of the second amended complaint.  Defendants Whiteman and Richardson are entitled to dismissal of the remaining claims against them.  The plaintiff may proceed with his claims against defendants Toadvine, Ondrovick, and Borton, but only to the extent that the plaintiff contends that their deliberate indifference caused Yolanda Flores to suffer needlessly while she was alive.  The plaintiff has conceded that he cannot prove that the conduct of these defendants caused Ms. Flores's death.

Accordingly, it is **ORDERED** that the motion to dismiss or for summary judgment by defendants Lenawee County and Sheriff Larry Richardson [dkt # 69] is **GRANTED**.

It is further **ORDERED** that the motion to dismiss or for summary judgment by defendants Whiteman, Toadvine, Ondrovick, and Borton [dkt # 67] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the motion to dismiss or for summary judgment by defendants Dye and Swinehart [dkt #68] is **DISMISSED as moot**.

It is further **ORDERED** that the case is **DISMISSED WITH PREJUDICE** as to defendants Lenawee County, Sheriff Larry Richardson, and James Whiteman.

It is further **ORDERED** that the case management and scheduling order is **AMENDED** so that motions *in limine* shall be filed **on or before November 25, 2008**; the joint final pretrial order shall be lodged in chambers **on or before December 16, 2008**; the final pretrial conference shall be held on **December 23, 2008, at 10:30 a.m.**; and trial shall commence on **January 6, 2009, at 8:30 a.m.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   October 15, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 15, 2008.

s/Felicia M. Moses
FELICIA M. MOSES